IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RONNEL FITZGERALD,

                Plaintiff,

    v.

JASON ACHTERBERG, MARIO T. CANZIANI,           OPINION and ORDER
REED RICHARDSON, KYLE D. ESLINGER,
MARY REIMER, PATRICK J. LYNCH,             19-cv-774-jdp
and CHRISTINE PRESTON,

                Defendants.

Plaintiff Ronnel Fitzgerald, appearing pro se, is a prisoner at Stanley Correctional Institution. Fitzgerald complained about being sexually harassed by an inmate coworker; after the investigation was completed, his allegations were deemed unfounded and he was transferred to another unit. Fitzgerald contends that defendant prison officials retaliated against him by transferring him to another unit and failing to arrange for a similar paying job at his new unit.

Defendants have filed a motion for summary judgment. Dkt. 26. I will grant that motion and dismiss the case because Fitzgerald fails to show that his transfer and termination were the result of defendants' retribution for his filing a complaint, as opposed to defendants' appropriate response to security concerns raised during the investigation.

There is a preliminary matter: Fitzgerald has filed a motion for leave to file a sur-reply, stating that he would like to present more evidence to explain the prison's practice of inmates with similar jobs being "traded" between units so that inmates who are going to be transferred can keep jobs at similar pay. Dkt. 59. But sur-replies are generally disfavored by the court, and Fitzgerald doesn't give a good reason to delay the proceedings for more briefing. He says that

with limited law library time due to the COVID-19 pandemic he had limited time to research his arguments and complete his briefs. He also says that from their reply, defendants seem to misunderstand what he meant by the concept of inmates being traded between units. But Fitzgerald has already submitted substantial materials in opposition to the summary judgment motion, including about the prison's employment policies, so his law library time doesn't seem to be a problem. And I disagree that defendants fail to understand what Fitzgerald meant by the trading of inmates. To the contrary, they agree that unit managers sometimes allow trades. His dissatisfaction with defendants' reply materials is not a reason to order more briefing. I will decide defendants' summary judgment motion using the materials already submitted.

UNDISPUTED FACTS

The facts are undisputed unless otherwise noted.

Plaintiff Ronnel Fitzgerald is a prisoner at Stanley Correctional Institution. At the times of the events in question, defendant Reed Richardson was the warden, defendant Mario Canziani was the deputy warden, defendant Jason Achterberg was the security director, defendant Patrick Lynch was a unit supervisor, defendant Christine Preston was the DOC's Prison Rape Elimination Act (PREA) director, defendant Mary Reimer was a unit supervisor, and defendant Kyle Eslinger was a captain and PREA compliance manager. Reimer and Eslinger were trained PREA investigators.

On May 22, 2016, Fitzgerald called the PREA hotline and reported that he had been sexually harassed by inmate Franklin Coleman while they worked together in the prison's servery. Accordingly to Fitzgerald, Coleman harassed him again two days later. Fitzgerald reported his allegations to defendant Lynch. Fitzgerald explained that Coleman flirted with

2

him, told Fitzgerald that he liked him, and made a sexual reference. Lynch asked Fitzgerald if Coleman touched him; Fitzgerald responded that Coleman may have brushed against him while he was reaching for a broom in the closet. Fitzgerald told Lynch that he had contacted the PREA hotline a couple of days earlier.

Lynch placed Fitzgerald on paid leave from his work assignment in the servery pending the outcome of the investigation; Lynch thought it made sense to temporarily remove Fitzgerald from the area where the alleged harassment happened. Lynch contacted a non-defendant PREA investigator, who advised Lynch to write an incident report. Lynch drafted a report and sent it to defendant Security Director Achterberg. The investigator emailed Achterberg and defendant Canziani about Lynch's report. Around the same time, Achterberg received an email letting him know about Fitzgerald's PREA hotline call. Canziani told Lynch that Achterberg had assigned the investigation to defendant Reimer. The DOC's practice was to assign two investigators to investigations like this, so Achterberg also assigned defendant Eslinger to the matter.

Later on May 24, Coleman went to defendant Lynch's office. Defendants say that Coleman did this because he had heard that someone had filed a report against him, he was concerned, and he wanted to ask Lynch if he knew anything about it. Fitzgerald says that Coleman was angry at Fitzgerald for not showing up to work that day, so he went to Lynch's office to get Fitzgerald fired.

Lynch told Coleman that someone on his work crew had reported him and that the two would be separated for security reasons, regardless of the investigation's outcome. Coleman later told investigators that Lynch had told him that prison officials would be moving his accuser out of the unit "no matter what." Dkt. 52-7, at 8. It's unclear whether Coleman knew

3

that Fitzgerald was the complainant at this point; Fitzgerald believes that Lynch told Coleman that Fitzgerald was the one who complained. Lynch denies that he told Coleman this and that Coleman was misinterpreting what he said. Lynch says that he told Coleman that he and his accuser would be separated and that he perhaps said that one of them would be moved no matter what because it would be a security problem for the two of them to remain in the same unit.

On May 25, a non-defendant supervisor placed Coleman in temporary lockup pending an outcome on Fitzgerald's PREA complaint. Before Coleman was placed in temporary lockup, Fitzgerald saw him talking to fellow inmates Mark Perez, Jeffrey Mayer, and Billy Cannon. About a week later, these inmates each approached Fitzgerald and asked him for information about the incident. Fitzgerald didn't share details of the incident with them.

On June 3, defendants Reimer and Eslinger interviewed Fitzgerald. Fitzgerald explained that Coleman had helped get him the job in the servery in early May 2016. Once he started working there, Coleman sexually harassed him on a regular basis, often when they both were in a servery closet. Coleman told Fitzgerald in an overly friendly way that he liked him and that he was good looking. Coleman told Fitzgerald that he got him the servery job because he "wanted him." Dkt. 52-2, at 6. Coleman would put his arms around Fitzgerald, touch him on the shoulders, arms, or stomach "in a sensual manner," and on one occasion he touched Fitzgerald's buttocks. *Id.* at 8. Another time Coleman tried to kiss Fitzgerald.

Fitzgerald also talked about the repercussions he faced from other inmates for complaining about Coleman. He told the investigators that he was on paid leave after the incident because he "felt uncomfortable about being in there." *Id.* at 17. He said that Coleman had "got everybody running and calling me 'Snitch' and stuff." *Id.* at 19. He said "there's been

4

some rumors floating around here that somebody tried to . . . put something in my, they was planning on putting something in my cell to discredit me from . . . this incident." *Id.* at 21. He said that "Coleman here has a lot of friends that . . . are vehemently against what's happening to him" and that "Coleman does have a lot of power on this wing, here, or this unit." *Id.* at 22. Another inmate told him that "there might be some type of retribution behind what happens to [Coleman]" and "if something bad happens to him, then somebody might want to fight me or something." Fitzgerald noted that no one had explicitly threatened him. He would not give defendants the names of anyone who could verify the rumors about retribution. Defendants Reimer and Eslinger say that they chose not to investigate Fitzgerald's alleged rumors of retribution further because Fitzgerald refused to share the names of anyone who could verify those rumors.

Reimer and Eslinger interviewed inmates Perez and Mayer, who also worked in the servery. Defendants say that Reimer and Eslinger interviewed Perez and Mayer because Fitzgerald had identified them as possible witnesses; Fitzgerald says that those inmates were already waiting outside the office to be interviewed before Fitzgerald mentioned them to the investigators. Both Perez and Mayer denied seeing inmate Coleman flirt with or inappropriately touch Fitzgerald.

Defendants Reimer and Eslinger also decided to interview inmates Cannon and Maurice Hall. They interviewed Cannon because he was the "unit clerk," an inmate whose job allowed him to move throughout the unit; they thought that Cannon may have heard something relevant to the investigation. They interviewed Hall because he was Fitzgerald's cellmate. Hall was not present for any of the alleged incidents, but he told them that Fitzgerald had talked to him about Coleman's harassment, and that Coleman had originally picked Fitzgerald for a

servery job. They did not interview inmate Terry Mueller, who was not a servery worker but who had talked to Fitzgerald about Coleman being interested in Fitzgerald working in the servery.

Because Fitzgerald saw Coleman talking to Perez, Mayer, and Cannon and because they were already waiting outside the office during Fitzgerald's interview, Fitzgerald believes that defendants "preplanned" those witnesses or that they were coached by Coleman or defendants.

None of the witnesses corroborated Fitzgerald's version of events, with the exception of Hall recounting what Fitzgerald had told him about events that Hall was not present for. Defendants Reimer and Eslinger say that at that point they believed that unless Coleman admitted to the allegations, the evidence suggested that Fitzgerald's allegations were unfounded.

Reimer and Eslinger then interviewed Coleman, who denied Fitzgerald's harassment allegations. Coleman said that when he spoke with Fitzgerald on May 24, Fitzgerald told him that he was uncomfortable with Coleman, which Coleman took to mean that Fitzgerald was uncomfortable with Coleman as an openly gay man. It was at this interview that Coleman stated that defendant Lynch had previously told him that officials would be moving the complainant out of the unit "no matter what." Dkt. 52-7, at 8. Reimer and Eslinger say that they found Coleman's statements and demeanor credible.

Under Department of Corrections PREA rules, investigators are required to "review prior complaints and reports of sexual abuse involving the suspected perpetrator." Dkt 30-5, at 15. Defendants Reimer and Eslinger did not review Coleman's history as part of this investigation. They say that they didn't conduct such a review in this case because Fitzgerald didn't ask them to, Fitzgerald's identified witnesses did not corroborate his allegations, and

6

Coleman's history would not have changed the strength of the information they had already received. Fitzgerald submits documents showing that Coleman was disciplined in 1999 and 2000 for soliciting sexual intercourse from other inmates and in 2009 for having consensual sexual contact with another inmate. In 2013, Coleman was investigated for having consensual sexual contact with another inmate; that investigation was closed with "no evidence of PREA related concerns." Dkt. 52-19, at 1.

Because Reimer and Eslinger believed that Fitzgerald's allegations would be deemed unfounded, they thought that it was no longer proper to hold Coleman in temporary lockup. They discussed Coleman's release with defendant Achterberg, who approved it.

Reimer and Eslinger say that because of Fitzgerald's comments about potential retribution against him, they decided to move Fitzgerald to another unit; he was ultimately moved to Reimer's unit. Moving Fitzgerald off the unit meant that he could not keep his current job; an inmate must live on the unit to retain that unit position. They placed Fitzgerald on "INVUNA," meaning "involuntary unassigned," status. On this status, inmates are paid a rate lower than what Fitzgerald had been making at his servery job, but that status enables an inmate to apply for a new job. Fitzgerald says that there are ways he could have been transferred into a similar-paying job in the new unit: there have been times that officials have "traded" inmates with similar jobs or rates of pay between units so that both inmates can keep similar jobs or pay. Fitzgerald submits a declaration by fellow inmate Anthony Lewis, who states that he was allowed to keep his rate of pay for about a month after being unable to work due to COVID-19 symptoms.

A DOC handbook on prison sexual assault, sexual harassment, and PREA complaints states that "every effort will be made to assure the victim's protection without restricting access

to work, education or programming," and that "[v]ictims or witnesses will never be punished for reporting sexual abuse." Dkt. 52-8, at 13, 14.

After interviewing Coleman, defendants Reimer and Eslinger asked to speak with Fitzgerald again. Fitzgerald was joined by non-defendant Sergeant Clark for security purposes. Defendants Reimer and Eslinger told him that he would be transferred to a new unit and that he would not immediately be given a new job; instead he would be placed on INVUNA status. Fitzgerald asked for a different outcome, like being traded into a new job, but Reimer and Eslinger did not change their minds. Fitzgerald says that Reimer and Eslinger "acted like they held some kind of animosity against [him] and were defiant in their replies," and Sergeant Clark smiled at him in a hostile way. Dkt. 52, at 5.

Fitzgerald was unhappy about the move, and he threatened Coleman, stating that "trouble was going to be had for him" and "something's going to happen if he gets out of the hole." Dkt. 30-1, at 110. Fitzgerald received a conduct report for threatening Coleman. Fitzgerald's receipt of a conduct report made him ineligible for a new institution job upon transfer.

In late June, Fitzgerald sent correspondence to defendant Warden Richardson, complaining about the investigation; Richardson responded the next day, stating that the investigation had not yet been completed. Fitzgerald sent a letter to defendant Security Director Achterberg stating that Coleman was being unfairly exonerated for his misconduct, that "[n]o gate will ever get in the way of me getting justice," that "the only way to prevent this from happening is to remove one of us," and asking, "Do you want peace in this prison or do you want a blood bath?" *Id.* at 29–30. Achterberg did not respond to this letter because he believed the issue was addressed in the warden's previous response. Fitzgerald says that he

8

wrote further to Richardson asking staff to look into Coleman's history of sexual assault and harassment but Richardson didn't respond.

On July 26, defendants Reimer and Eslinger submitted their report to defendant Achterberg. Based on the evidence, they recommended a disposition of "unfounded," meaning that investigators concluded that events did not occur as Fitzgerald says they did. Achterberg reviewed the report and agreed that Fitzgerald's allegations were unfounded. The report was then forwarded to the warden's office, and defendant Deputy Warden Canziani reviewed the investigators' report and approved it. Defendants Richardson and Achterberg notified Fitzgerald of the outcome of the investigation.

Fitzgerald sent Richardson correspondence disagreeing with the outcome and saying that the investigation was biased and fraudulent. Richardson wrote back saying that while Fitzgerald may disagree with the outcome, an investigation occurred, and his allegations were deemed unfounded. Richardson also told Fitzgerald that he would have to contact law enforcement to press charges because his allegations were deemed unfounded in the internal prison investigation.

Fitzgerald filed a grievance accusing Reimer and Eslinger of firing him from his job for reporting Coleman for workplace sexual misconduct. The grievance was dismissed by defendant Richardson.

## ANALYSIS

Fitzgerald contends that defendants violated his rights under the First Amendment to the United States Constitution by terminating him from his job after he complained about being sexually harassed.

To state a First Amendment retaliation claim, a plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) defendants took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was a "motivating factor" in the defendants' decision to take those actions. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). If the plaintiff makes this showing, the burden shifts to defendants to show that they would have taken the same action even without the retaliatory motive. *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011). In considering a retaliation claim, the court must "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (internal quotations and citations omitted); *see also Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (citing *Babcock*).

Defendants concede that filing a sexual harassment complaint is a protected activity and that losing one's job is a type of deprivation that could deter a person of ordinary firmness from making complaints in the future. The parties dispute the causation element. I take Fitzgerald to be saying that there were two ways he was harmed by defendants' actions: he lost his unit job because defendants transferred him, and then defendants didn't find an employment alternative for him with a salary similar to his old job.

## A. Transfer

I'll start by discussing Fitzgerald's transfer. In one sense, it's clear that defendants transferred Fitzgerald because of his complaint: the complaint is indeed what started the process that resulted in Fitzgerald being transferred to another unit. But even assuming that this is enough for Fitzgerald to make a showing that his complaint was a motivating factor in

10

his transfer, defendants persuasively rebut that showing with evidence that the transfer happened because investigators Reimer and Eslinger appropriately responded to security concerns. Defendants correctly point out that it isn't enough to merely show that a negative consequence logically flowed from First Amendment-protected activity. "Establishing the causation element of retaliation requires a showing that the *fact* of the plaintiff's engagement in protected activity was a motivating factor of the alleged adverse action, not merely that the *substance* of the plaintiff's complaint motivated a response the plaintiff did not particularly like." *Holleman*, 951 F.3d at 879 (emphasis in original). The causation element is not met when officials make a "rational, justifiable response to the substance of the prisoner's complaint." *Id.*

In *Holleman*, staff transferred the plaintiff to a new facility after he made numerous complaints about his prison conditions; staff thought that he would "benefit from a change of scenery" at the new facility. *Id.* at 876. Defendants argue that their transfer of Fitzgerald here was similarly an appropriate, rational response to their investigation. Although Reimer and Eslinger concluded that the harassment allegations were unfounded, which might suggest that neither Coleman or Fitzgerald needed to be transferred, Fitzgerald's interview statements provided reason for Reimer and Eslinger to believe that it was unsafe to keep Fitzgerald on the unit. Fitzgerald told Reimer and Eslinger that Coleman "has a lot of friends" who opposed Fitzgerald's complaint and that Coleman "does have a lot of power" on the unit. Fitzgerald also told Reimer and Eslinger that Coleman told inmates that he was a snitch, that there were rumors about other inmates planning to plant contraband on him and about potential "retribution" against him, and that if Coleman was punished, "somebody might want to fight me or something." Fitzgerald wouldn't tell defendants who told him these things, which hampered defendants' ability to intervene other than by removing Fitzgerald from the unit for

11

his own safety. Then, upon learning about the proposed transfer and loss of job, Fitzgerald repeatedly threatened to harm Coleman. That only gave defendants more reason to keep Fitzgerald out of Coleman's unit.

Fitzgerald argues that this evidence isn't enough to show that defendants really transferred him because of safety concerns; he says that the investigation was a sham meant to protect Coleman. But many of Fitzgerald's assertions in support of his theory are based on unreasonable inferences from events. For instance, I take him to be saying that defendants conspired with Coleman to obtain favorable testimony from other inmate witnesses because Coleman was allowed to stay in general population for a day after Fitzgerald complained to Lynch, Fitzgerald saw Coleman talking with the witnesses, and the witnesses were already lined up out outside the office where Reimer and Eslinger were conducting his interview. Even taken together, these facts do not support Fitzgerald's theory, because they don't raise a reasonable inference that defendants conspired against him; all Fitzgerald has is his own speculation that these events occurred because defendants favored Coleman. *See, e.g., Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)).

Fitzgerald states that Lynch protected Coleman because they were friends or because Coleman worked as Lynch's informant. But Fitzgerald doesn't provide evidence from which one could reasonably draw these conclusions; Lynch says only that he knew Coleman for more than a decade and that Coleman was a good inmate worker. Coleman stated in a 2013 investigation interview that "everybody think[s] I'm a snitch, 'cause I will tell, that's the truth,

12

about anything that goes on in the kitchen," Dkt. 52-19, at 9, but that doesn't mean that Coleman was specifically working for Lynch or any other prison official as an informant.

Fitzgerald also believes that Lynch had sympathy for Coleman's plight because Fitzgerald believes that Lynch had previously been charged with sexual assault, citing in support a 2014 Wisconsin Court of Appeals decision involving a criminal defendant named Patrick J. Lynch. *See* Dkt. 52-17. Fitzgerald doesn't establish that defendant Lynch was the Patrick J. Lynch who was the criminal defendant in that case, and even if he had, it doesn't reasonably follow that Lynch would automatically side with inmates accused of sexual misconduct. And in any event, Fitzgerald's focus on Lynch is misplaced because Lynch didn't make the decision to transfer him or terminate him from his job: Reimer and Eslinger did.

Another major focus of Fitzgerald's materials is Coleman's interview statement that defendant Lynch told him at the outset of the investigation that his accuser would be transferred out of the unit "no matter what." Defendants say that this statement is inadmissible with two layers of hearsay: Coleman's statement is from a written report (the prison's PLRA investigation) and Coleman was relating what defendant Lynch told him. Defendants concede that Fitzgerald "may find an exception" for the fact that Coleman's statement was made in a PREA interview. Dkt. 55, at 4. Under Federal Rule of Civil Procedure 56(c)(2), Fitzgerald may present evidence at summary judgment that would be inadmissible at trial if the underlying facts could later be presented in an admissible form. *See also Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014). This layer of hearsay could be overcome by having Coleman testify. As for the fact that Coleman was relaying what Lynch said to him, that's a statement by a party opponent that isn't hearsay under Federal Rule of Evidence 801(d)(2).

Regardless of the statement's admissibility, the problem for Fitzgerald is that this statement alone isn't enough to support his claim that the transfer and job decision were motivated by the fact that he complained as opposed to the substance of the complaint. Given that Lynch wasn't the person who made the decision to transfer Fitzgerald, Lynch's statements are of limited relevance. Fitzgerald believes that Lynch was part of a conspiracy to protect Coleman and he notes that Lynch says that he may have spoken with defendant Reimer, who in addition to investigating Fitzgerald's claim was also another unit manager, about potentially transferring Fitzgerald to Reimer's unit. But neither side explains when this conversation happened or the details of it. The fact a conversation happened doesn't raise a reasonable inference that Reimer had agreed to transfer Fitzgerald "no matter what" for any reason, much less that Reimer agreed to transfer Fitzgerald for an unconstitutional retaliatory reason.

Fitzgerald says that Reimer and Eslinger's investigation was a sham because they conducted an inadequate investigation: they did not investigate Coleman's sexual misconduct history even though that was a PREA requirement, and they didn't interview all the servery workers or interview inmate Terry Mueller, who had talked to Fitzgerald about Coleman being interested in having Fitzgerald work in the servery.

Fitzgerald appears to be correct that Reimer and Eslinger failed to follow the prison PREA rule stating that investigators should check an accused inmate's prior record, and that they didn't interview every inmate who worked in the servery or inmate Mueller. But the violation of state rules or statutes does not itself amount to a constitutional claim. *Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004), *as amended* (June 4, 2004). The question isn't whether the investigation was perfect or even whether Reimer and Eslinger came to a correct

14

decision about the truth of Fitzgerald's allegations, but rather whether their actions raise a reasonable inference that they meant to retaliate against Fitzgerald.

There isn't any indication that that's the case here. For instance, there's no reason to believe that Reimer and Eslinger thought that Coleman was a notorious harasser and they ignored his record because they knew it would incriminate him. Coleman's prior record doesn't contain anything that is particularly incriminating with regard to the type of harassment Fitzgerald alleges. A 2013 investigation against Coleman was closed for lack of evidence, and his convictions for soliciting sexual intercourse from other inmates were more than 15 years before the events of this case and didn't involve harassment similar to Fitzgerald's allegations against him.

As for the number of witness who were called, it's unclear what the other servery witnesses who Fitzgerald now contends should have been interviewed would have said, but Fitzgerald himself suggested only inmates Perez and Mayer as servery workers who would have relevant information; both of those inmates were interviewed and they both failed to corroborate Fitzgerald's version of events. Fitzgerald says that inmate Mueller could have testified about Coleman recruiting Fitzgerald to work in the servery, but Fitzgerald and inmate Hall already testified about that, so there was good reason to pass on interviewing Mueller. There's any number of reasons that an investigator might stop short of interviewing every possible witness, ranging from a well-intentioned belief that more interviews would generate diminishing returns, to outright laziness. But Fitzgerald can prevail only if he shows that the decision was part of an intentional effort to retaliate against him; nothing in the record suggests that a retaliatory motive was the real reason Reimer and Eslinger finished without interviewing more witnesses.

15

And regardless whether Reimer and Eslinger could have performed a more thorough investigation, Fitzgerald testified that he faced possible retribution in the unit, which gave Reimer and Eslinger a sufficient reason to transfer him. Fitzgerald says that defendants are lying when they say that they moved him because he feared for his safety; he says that that he didn't actually believe the rumors about possible retribution against him. But the relevant question isn't what Fitzgerald thought of the threats, it's what Reimer and Eslinger thought of them. Fitzgerald told them about Coleman's friends and power on the unit and the rumors of retribution against him. He did not say that he didn't believe the rumors. Fitzgerald also says that Reimer and Eslinger "acted like they held some kind of animosity against [him] and were defiant in their replies," and Sergeant Clark smiled at him in a hostile way, but these statements are too vague to raise a reasonable inference that defendants acted with a retaliatory motive. Particularly given the deference owed to Reimer and Eslinger's assessment of penological concerns, *Babcock*, 102 F.3d at 275, no reasonable jury could conclude that Reimer and Eslinger transferred Fitzgerald because he complained, rather than the security concerns uncovered by the investigation.

## B.  Job placement

That leaves Fitzgerald's job placement following his transfer. Fitzgerald contends that Reimer and Eslinger retaliated against him by failing to place him in a job upon transfer that paid him similar to what he was making at his old servery job. In support of his effort to show that his complaint was a motivating factor in the job placement decision, Fitzgerald relies in part on his belief that the underlying investigation and transfer were retaliatory. But I've already concluded that a reasonable jury couldn't draw that inference form the facts here. He otherwise contends that Reimer and Eslinger could have placed him in his new unit's servery,

16

given him another job with similar pay, or placed him on leave with pay at a rate similar to his old job. The parties agree that staff generally tried to find a similar job placement for transferred inmates when possible.

But it is Fitzgerald's burden at summary judgment to provide evidence supporting his theories that jobs were available for him at the time Reimer and Eslinger made their decision, that it was conspicuously out of the ordinary for Reimer and Eslinger to place him on INVUNA status, and that the decision was made because of Fitzgerald's complaint and not for any number of other potential reasons. He fails to meet that burden. He notes that there were hundreds of similar-paying jobs in the prison as a whole, but he doesn't explain whether there were any job openings at the relevant time or whether he was qualified for any of those jobs (other than other servery jobs, which presumably he was qualified for). He also doesn't explain how significantly he was prejudiced from being placed in INVUNA status instead of Reimer and Eslinger placing him in a job; in that status he was free to apply for jobs himself. Fitzgerald lost the ability to apply for jobs right after hearing of Reimer and Eslinger's intention to place him on INVUNA status because he immediately threatened Coleman and was given a conduct report that made him ineligible for a new job. But Coleman is responsible for his loss of INVUNA status, not Reimer or Eslinger.

Fitzgerald discusses trading jobs with another inmate and he asked to submit a sur-reply to clarify what it means to trade inmate between units. As I discussed above in denying Fitzgerald's motion to file a sur-reply, defendants understand the concept of trading inmates. Fitzgerald's problem is that he doesn't explain how common it is to perform a trade, what considerations go into making such a decision, or whether a trade would have been a viable solution here.

Fitzgerald submits a declaration from inmate Lewis, who states that he was allowed to keep his rate of pay for about a month after being unable to work due to COVID-19 symptoms. But Fitzgerald's situation is nothing like an inmate who was prohibited to work because of an illness and he doesn't provide any reason to think that it was standard practice to similarly pay transferred inmates.

Ultimately, Fitzgerald doesn't provide enough evidence about the viability of other options available to Reimer and Eslinger when they decided to place him on INVUNA status for a reasonable jury to find that they chose that status to punish him. Nor does he provide any direct evidence that their decision was driven by retaliatory animus. In other words, even if Reimer and Eslinger *could* have made a different decision with respect to Fitzgerald's job status upon transfer, Fitzgerald doesn't show why their failure to do so was in retaliation for his making a complaint.

In summary, it's understandable why Fitzgerald was unhappy with the result of the sexual harassment investigation: it was he who ended up losing his job instead of the person he accused of harassing him. But he doesn't present evidence that could support a reasonable verdict that defendants Lynch, Reimer, and Eslinger retaliated against him for filing a complaint. I will grant defendants' motion for summary judgment on the claims against those defendants.

Fitzgerald also brings retaliation claims against defendant supervisors Richardson, Canziani, Achterberg, and Preston, whose involvement—if any—in these events was approving or failing to overturn Reimer and Eslinger's decisions. Fitzgerald doesn't present any evidence that these particular defendants acted with retaliatory intent aside from his speculation that they conspired with Lynch, Reimer, and Eslinger to punish him. Given that I've already

18

concluded that defendants are entitled to summary judgment on Fitzgerald's claims against defendants directly involved with the PREA investigation, I will also grant summary judgment for defendants on the claims against the supervisory officials.[1] Because I will grant summary judgment to defendants on all of Fitzgerald's claims, the case will be dismissed.

ORDER

IT IS ORDERED that:

1. Plaintiff Ronnel Fitzgerald's motion for leave to file a sur-reply, Dkt. 59, is DENIED.

2. Defendants' motion for summary judgment, Dkt. 26, is GRANTED.

3. The clerk of court is directed to enter judgment accordingly and close the case.

Entered March 3, 2021.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

---

[1] Defendants also contend that they are entitled to qualified immunity on Fitzgerald's claims. Because I am dismissing Fitzgerald's claims on substantive grounds, I need not consider defendants' qualified immunity argument.

19